416

753 S.E.2d 402

The STATE, Respondent,

v.

Ashley N. HEPBURN, Appellant.

Appellate Case No. 2011–190695.

No. 27336.

Supreme Court of South Carolina.

Heard Dec. 4, 2012.

Decided Dec. 11, 2013.

Rehearing Denied Jan. 31, 2014.

Andrew A. Mathias, of Nexsen Pruet, LLC, of Greenville, for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Salley W. Elliott, all of Columbia, and Solicitor Jerry W. Peace, of Greenwood, South Carolina, for Respondent.

E. Charles Grose, Jr., of The Grose Law Firm, LLC, of Greenwood, and James W. Bannister, of Bannister & Wyatt, LLC, of Greenville, for Amicus Curiae, South Carolina Association of Criminal Defense Lawyers.

Chief Justice TOAL.

Ashley N. Hepburn (Appellant) appeals her conviction for homicide by child abuse. We reverse the circuit court's denial of Appellant's mid-trial motion for a directed verdict.

### FACTS/PROCEDURAL BACKGROUND

On the evening of October 13, 2009, sixteen-month-old Audrina Hepburn (the victim) became unresponsive and was admitted to the hospital in Greenwood, South Carolina. She eventually died in a Greenville hospital on October 17, 2009. No one, including Appellant, disputes that the victim died from child abuse. There were only two people who could have killed the victim, either Appellant or her boyfriend of five months, co-defendant Brandon Lewis, as they were home with the victim on the night she sustained her fatal injuries.

Appellant and Lewis invoked their rights to a jury trial, and the State chose to prosecute them as co-defendants in a joint trial that took place from February 22 to March 3, 2011.[1]

### A. The State's Evidence

At the time of her injuries, the victim resided with her two-year-old brother, Owen, Appellant, Appellant's mother, Doris Davis, and Davis's boyfriend, David Crumley.

---

1. On May 15, 2013, the court of appeals reversed Lewis's conviction for aiding and abetting homicide by child abuse. *See State v. Lewis*, 403 S.C. 345, 743 S.E.2d 124 (S.C.Ct.App.2013). The State's petition for a writ of certiorari from that decision is pending before this Court.

On the evening of October 12 between 8:00–8:30 p.m., Appellant, the victim, Owen, Davis, and Crumley ate dinner together. After dinner, Appellant ran a bath for the children, and Davis and Crumley went to bed on the opposite side of the residence just as Lewis arrived.[2] Lewis helped Appellant get the children ready for bed. Appellant described the victim as "fussy" before bedtime, and stated she gave the victim a bottle at approximately 9:00 p.m. She also administered Orajel to the victim because she was teething. After putting the victim to bed, Appellant, Lewis, and Owen watched football in the living room. At approximately 10:00 p.m., Appellant got Owen ready for bed and "popped" him when he would not brush his teeth. She and Owen then got into bed in her bedroom, and she read books to Owen until they both fell asleep while Lewis continued watching television in the living room. Around 11:00 p.m., Lewis checked on the victim for the first time. When he opened the door to the victim's room, the victim "popped her head up."[3] Lewis then entered Appellant's bedroom, and tried to wake her up to ask her if she wanted to watch a movie or eat any of the food his grandmother made for him to bring over. She declined and fell back asleep. Therefore, Lewis made food for himself and sat down in the living room and resumed watching television. Between 1:00–1:30 a.m., Lewis checked on the victim again.[4] This time, the victim "didn't stick her head up so I thought she was asleep.... When I seen [sic] her she was laying [sic] on her

---

2. Crumley and Davis went to sleep in their bedroom at approximately 9:00 p.m. on the opposite side of the house and did not come out of their bedroom again until they were awoken between 1:15–1:20 a.m. to Appellant's distraught crying, and found Appellant in the living room huddled over the limp victim. Lewis told Crumley he went to check on the victim, found her lying face down in her crib with her head up against the rails, shaking "as if she was [sic] cold or having a seizure." Davis testified Lewis "kept repeating" that he found the victim "face down horizontal in the crib."

3. In one statement to police, Lewis stated he then "shut the door.... I didn't hold her then, but I did earlier in the night. I didn't shake her or anything."

4. In one statement to police, Lewis said that he routinely checked on the victim when he stayed at Appellant's house, and that the walls of the house were so thin that he usually could hear if the victim was crying. On the night in question, he stated the victim was not crying.

stomach with her head on the rails of the crib. I woke [Appellant] up and I told her I couldn't get [the victim] awake." Appellant awoke to Lewis holding the unresponsive victim in his arms. Appellant and Lewis then woke Davis and Crumley, who called 911.

The victim was taken to Self Regional Hospital in Greenwood. When she arrived, no history of falls, injuries, traumas, or other illnesses was reported to physicians. However, treating physicians and paramedics noticed numerous bruises and petechiae [5] on the victim's body, retinal hemorrhaging, labored breathing, and overall lack of responsiveness. Upon closer inspection, physicians determined that the victim sustained a subdural hematoma. Dr. Michelle Curry, who treated the victim at Self Regional testified that the subdural hematoma extended from the front to back of the right side of the victim's brain and was "fairly extensive." [6] Dr. Curry opined that the victim's injuries were caused by an acceleration-deceleration movement, as in a car accident or shaken baby syndrome.[7] Likewise, Dr. Robert Seigler, the medical director of the pediatric intensive care unit at Greenville Memorial Hospital where the victim was transferred, opined that due to the nature of her injuries, the victim sustained abusive head trauma due to child abuse. Dr. Mary–Fran Croswell, who also examined the victim at Greenville Memorial Hospital,

---

5. At trial, it was explained that petechiae are caused by the rupture of microscopic blood vessels underneath the surface of the skin, similar to bruising.

6. Dr. Curry explained:

A subdural hematoma is not something that happens spontaneously. There are types of bleeding in the brain that can happen spontaneously. Subdural hematomas are the result of trauma because it involves a tearing of veins between layers. There is some amount of, we call it acceleration-deceleration of shaking or wiggling that happens. If you think of the brain as jello inside of a very hard mold and if you shake the mold hard enough the jello separates from the side. When that happens in the brain the little veins that are in between the mold and the jello tear and you get the bleeding around the brain or the jello which then eventually compresses it.

7. Dr. Curry defined "shaken baby syndrome" as a "well described entity in the pediatric and emergency medicine literature," in which "a child is being disciplined or is so aggravating they are shaken ... and it can result in both the retinal hemorrhages and the subdural hematoma."

testified that she could not rule out a "direct impact force," "acceleration-deceleration forces," or some "combination of the two." [8]

All of the victim's treating physicians testified that the victim would not have appeared "normal" almost immediately after sustaining this type of injury. Dr. Seigler testified that the victim "would of [sic] had·symptoms virtually immediately after an injury this severe and she would have at the least been in a coma and likely have had more severe symptoms than that." Dr. Croswell testified that the severity of the injuries would have brought about a drastic change in a toddler's demeanor that would have been instantly noticeable to her adult caregivers.

While the victim was receiving treatment at Self Regional Hospital, the hospital chaplain, Alexander Brown, met with Appellant and Lewis. At trial, Brown testified that Lewis explained that he was the only person awake at the residence and that he was watching television when he realized he had not checked on the victim in an hour and a half. He stated he would normally open the door or knock to "see if [the victim] would wake up or acknowledge his presence there at the door." However, this time, Lewis found the victim "sideways with her face careened against the side of the crib" instead of her normal posture of "head to foot." Upon closer inspection, he noticed the victim was unresponsive. Brown testified that Appellant was present while Lewis recounted his version of events and did not dispute his story:

> They both seemed concerned but they appeared united in their story and understanding of what was going on at the time. There wasn't any dispute about [Lewis's] description. And, let's see, let me find my words here. They didn't seem any more like outrageously concerned like something was very, very seriously wrong. They weren't over [sic] emo-

---

8. While Dr. Croswell testified that the victim's injuries were as severe as if she had fallen "from several stories, more than a story high," she concluded that "[w]ithout a history of significant accidental injury such as ... a motor vehicle crash or a fall from several stories, this constellation of findings [was] most consistent with abusive head trauma."

tional, they seemed collected as it were, just really concerned.

Brown testified further that at one point Lewis

said one statement in the middle of his explanation of how he found [the victim]. It concerned me and it seemed odd. In the middle of his statement he explained that [the victim], "didn't like him but he loved her."

Neither party accused the other of any wrongdoing at that time.

The State's evidence also hinted at the possibility of prior abuse. In the weeks leading up to the fatal injuries, Appellant brought the victim to her pediatrician three times to treat a petechial rash. In addition, the victim's father and Appellant's estranged husband, Daniel Hepburn (Daniel), and his mother, Rita Ebel, testified that they both noticed that the victim had a chipped tooth and a bruise on her forehead, which Appellant claimed was caused by the victim striking her head on her crib. Daniel testified that Appellant was concerned about the rash and took the victim to the doctor for treatment. However, when Daniel confronted Appellant about the petechial rash after accompanying the victim to one of her doctor's appointments, Daniel testified Appellant became "defensive right away" and stated that "no one had choked her." [9] In addition, Appellant told Daniel that she did not know how the victim chipped her tooth, but that it "must have happened with her being a little kid."

After a visit on October 8, Daniel did not see the victim again until she was in the hospital. He testified he saw Lewis at the hospital in Greenwood, and Lewis "stated, in his opinion she had had a seizure," as "he walked in to check on her and she was rigid at one point, seemed like she had had a seizure along those lines."

Daniel further testified about the breakdown of his marriage to Appellant, stating their marital problems began when the victim was born prematurely. Daniel testified that the

---

9. On redirect, Daniel testified that Appellant got defensive because she knew Daniel did not like Lewis to be around the children, and "[s]he got defensive right away as far as me questioning him being around the children, me questioning her right as a parent to allow him around the children."

couple decided to divorce in May 2009, and shortly thereafter he learned that Appellant and Lewis "were a couple." Finally, over Appellant's objection, Daniel testified that Appellant struck him during a fight they had while intoxicated when Appellant visited him in Washington in February 2009 to reconcile their marriage.

Under cross-examination, Daniel testified that Appellant was a good mother, who nursed the victim when she was born prematurely and was never violent with the children. Furthermore, he testified that he had agreed to Appellant receiving primary custody of the children during a custody hearing. Under further cross-examination by Lewis's counsel, Daniel stated that he spoke with Appellant by telephone on October 12 and she seemed "frustrated" because the victim was teething, but "not more than normal." He testified he later learned that Appellant found out that she did not receive a job offer as hoped on the day before the victim sustained the injuries.

Likewise, both Crumley and Davis testified that Appellant was a good and loving mother, who was attentive to her children.[10] Both testified that they saw a bruise in the middle of the victim's forehead prior to her hospitalization. Davis testified that Appellant brought the bruise to her attention and they attempted to discover the cause of the bruise in the home, and that Appellant took the victim to the doctor because she was concerned about the petechial marks on the victim's neck. Davis testified she did not notice any other bruising on the victim's body when Appellant bathed her earlier in the night.

### B. Directed Verdict Motion

At the close of the State's evidence, Appellant moved for a directed verdict pursuant to Rule 19, SCRCrP, claiming the State had failed to present substantial circumstantial evidence that Appellant committed the crimes charged.[11] Instead, Ap-

---

10. In contrast, Crumley testified that Lewis frequented the home sporadically, his contact with the victim was "[v]ery limited," and Lewis "[n]ever had anything to do" with the victim other than see her at the residence.

11. Pursuant to Rule 19(a), "On motion of the defendant or on its own motion, the court shall direct a verdict in the defendant's favor on any

pellant's counsel argued, the State's evidence merely rose to a suspicion that Appellant committed the crime, and this mere suspicion was insufficient to survive a directed verdict motion, in that the State had only proven that Appellant was in the home when the victim sustained the fatal injuries. While Appellant's counsel conceded that the State had proven that the child died from homicide by child abuse, he argued that the State had not proven that the child abuse was inflicted by Appellant. Finding it could be logically deduced from the circumstantial evidence that one of the two defendants violently shook the victim causing her injuries, the court denied Appellant's motion for directed verdict. The trial judge stated that the jury would be given a "mere presence" charge, would have the opportunity to evaluate the witnesses' credibility, and could ultimately conclude that either defendant was not guilty.

### C. Appellant's Defense

Appellant's testimony largely corroborated the State's evidence.

Appellant testified that October 12 was a normal day, and she, Crumley, Davis, and the children ate dinner between 8:00–8:30 p.m., after which Appellant bathed the children. Lewis arrived at the residence while Appellant was bathing the children, and helped Appellant dress them for bed. Meanwhile, Davis and Crumley went to bed. Appellant, Lewis, and the children watched television, and then Appellant put the victim in her bed. Appellant testified the victim was tired and irritable, so she gave her a bottle. Appellant and Lewis smoked a cigarette on the back porch, and heard the victim crying. Therefore, Appellant took the victim out of her crib and administered Orajel for teething, and then placed her back in her crib.

Once Appellant reentered the living room, Owen accidentally hit Lewis in the face with his elbow while they were playing, and Appellant and Lewis fought over Appellant's disciplinary tactics. Appellant told Owen to brush his teeth, and she

offense charged in the indictment after the evidence on either side is closed, if there is a failure of competent evidence tending to prove the charge in the indictment." Rule 19, SCRCrP. Moreover, "[i]n ruling on the motion, the trial judge shall consider only the existence or non-existence of the evidence and not its weight." Id.

spanked him when he would not follow her instructions.[12] Appellant subsequently entered the victim's bedroom to retrieve books to read to Owen, and the victim looked up at her and appeared normal. Appellant testified she and Owen both fell asleep reading books together in Appellant's bed. Appellant woke up when Lewis offered her food his grandmother had prepared, and the next thing she remembered was waking up again to Lewis holding the unresponsive victim in his arms. Appellant testified Lewis was acting "odd" and "collected," but she panicked when she realized the victim was not responsive.

Appellant testified that she and Lewis had been dating for approximately six months. She stated that the victim would "cry and cling" to her when Lewis was around, but that she did not think that was unusual at the time, just that "she . . . didn't take to him." Appellant testified that Lewis was the only person awake in the house at the time the victim sustained her injuries and was the only person who could have harmed the victim.

She testified that the victim was born prematurely and was in the hospital for eight weeks. Appellant spent a portion of every day in the NICU with the victim during this time. Appellant testified she "needed help" with the children, as the preterm birth put stress on her relationship with Daniel and finances, so she moved back into her mother's home from Washington, where Daniel was stationed in the military. Appellant testified that she and Daniel had rekindled their relationship after the victim's death and were still in a relationship at the time of trial.

Appellant testified that, outside of visitation for Daniel, she was with her children "[t]wenty-four, seven." As to the victim's previous injuries, Appellant testified she was concerned about the petechial rash, and noticed the chipped tooth and bruising to the victim's forehead and assumed she hit her head on her crib. Appellant testified that she took the victim to her doctor three times to follow-up on the petechial rash. Moreover, she was in the process of finding a dentist to fix the

---

12. Appellant testified she never used corporal punishment on the victim, and the only time she ever used corporal punishment on either child was when she "popped [Owen] on the backside" when he would not brush his teeth on October 12.

victim's chipped tooth. She also testified she attempted to add padding to the crib bar so that the victim would not injure herself on it again.

### D. Lewis's Defense

On the other hand, Lewis's defense painted a markedly different version of events. Lewis testified he stopped by Appellant's home on October 12 at approximately 3:30 p.m. While there, Lewis testified, Appellant slapped him in the face because he called her a "bitch" for throwing a pillow at him after he playfully threw the pillow at her. Lewis testified Appellant "was stressed" because she had not received a job offer as hoped. Lewis went home, and did not return until after dinner later that evening around 8:30 p.m. When he arrived, Lewis helped Appellant dress the children for bed, and they all watched television together. Lewis testified that Owen accidentally hit him in the face with his elbow, and he and Appellant argued over disciplining Owen. At approximately 10:00 to 10:30 p.m., Appellant then told Owen repeatedly to brush his teeth, and when he would not comply with her instructions, Appellant "yanked" Owen by the arm, took him into the bathroom, and Lewis heard Appellant "pop" Owen at least four or five times. Lewis testified he had never known Appellant to strike her children before this night. To "avoid" Appellant, Lewis began watching television again. At this point, Appellant and Owen were in Appellant's bed, and the victim was in her bedroom in her crib. Around 11:00 p.m., Lewis asked Appellant if she wanted to watch a movie, and she declined. Lewis testified, "[w]hen I asked her to watch a movie I think [Appellant] was still awake."

At some point, Lewis checked on the victim by peering into the room from the doorway, and she seemed "fine." Lewis testified "she was really a light sleeper and she was just popped her head up and I let the door shut back and just went back and started watching TV." Next, he testified he heard the victim "faintly crying" and then "heard [Appellant] get up and stomp into the room, I actually felt her footsteps." Lewis testified, "I can remember hearing [Appellant] stomp into the room I heard her go into the room and I can remember [the victim] crying a little bit. And then she wasn't crying and [Appellant] went out of the room." Lewis testified that the

victim's cries were different from her normal cries. He testified he heard "short pauses in between [the victim's] cry and it just, it sounded to me like she could have been shaken." Lewis testified that the crying then stopped and Appellant left the victim's bedroom. However, Lewis testified, at the time, he "didn't think anything had happened to [the victim]." Rather, he "just thought her mom went in there and checked on her." Lewis then heard Appellant walk back to her bedroom. Waiting until she was calm because he figured Appellant was agitated, Lewis returned to Appellant's room to ask her if she wanted something to eat and she declined. Therefore, Lewis fixed himself something to eat.

After he ate and because he was preparing for bed, he checked on the victim a final time. This time, Lewis testified he saw the victim lying horizontally, facedown, with her head against the bars of her crib, and when he went to straighten her, he noticed she was bleeding from the mouth, barely breathing, and limp. He picked her up and ran to Appellant's bedroom. Lewis testified Appellant went to the bathroom and then Lewis handed the victim to her in the hallway. Lewis testified he thought the victim had a seizure because he had experienced seizures in the past and the victim's mouth was bleeding. Lewis testified he and Appellant then woke Davis and Crumley.[13]

Lewis testified he withheld this version of events in previous statements because he loved Appellant and wanted to protect her. Lewis testified he did not inflict harm on the victim or shake her. However, while at the police station on October 13, Lewis testified he did not believe Appellant had done

---

13. This testimony corroborated Lewis's second statement to police, which was introduced by Lewis at trial. In this second statement, Lewis stated:

> [Appellant] got Owen to brush his teeth and then put [the victim] in her crib. [Appellant] then went to bed with Owen and I went to the living room to watch TV. I watched the football game and then around 11:00 in the p.m. I went to check on [the victim]. When I went to check on her at that point [the victim] was fine laying [sic] in the crib. I started watching TV again and then around 12:45 in the a.m. I heard [the victim] crying in her room. I then heard some loud footsteps coming from the back of the house where [Appellant] and Owen were located at. [The victim] started crying even louder as if she was being shaken.

anything to harm the victim. With respect to his first state-
ment, Lewis testified that he "left out that we had gotten into
an argument, . . . that she had slapped me in the face, . . . that
I heard her going to [the victim's] room." However, upon
speaking with his grandmother and because he felt the police
did not believe his first statement, Lewis gave the second
statement. Lewis testified that when the police came to his
house later to interview him, he ran to a friend's house
because he feared he would be arrested. The day after the
victim's death, Lewis attempted suicide by taking an overdose
of pills. However, Lewis testified that he did not harm the
victim.

Lewis re-called an investigating officer to the witness stand,
who testified that after Lewis's second statement was shown
to Appellant later in the afternoon on October 13, she alleged-
ly exclaimed "oh my god all of this is true but I don't
remember hurting my baby."

### E. Renewal of Directed Verdict Motion

The jury found Appellant guilty of homicide by child abuse
and Lewis guilty of aiding and abetting homicide by child
abuse. The trial court sentenced Appellant to 45 years'
imprisonment and Lewis to ten years' imprisonment suspend-
ed upon the service of seven years.

At the close of the case, Appellant renewed her motion for
directed verdict, which the trial court denied.

Appellant filed a timely appeal in the court of appeals. On
October 3, 2012, this Court certified this case for review
pursuant to Rule 204(b), SCACR.

### ANALYSIS

Appellant argues the trial court erred in denying Appel-
lant's motion for directed verdict. We agree.[14]

---

14. We need not reach the remaining evidentiary and constitutional
issues, as this issue is dispositive. *See Futch v. McAllister Towing of
Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999)
(holding appellate courts need not address remaining issues when
determination of prior issue is dispositive).

## A.  Standard of Review

■ In cases where the State has failed to present evidence of the offense charged, a criminal defendant is entitled to a directed verdict. *State v. Cherry*, 361 S.C. 588, 593, 606 S.E.2d 475, 478 (2004). During trial, "[w]hen ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight." *Id.* at 593, 606 S.E.2d at 477–78 (citing *State v. Gaster*, 349 S.C. 545, 555, 564 S.E.2d 87, 92 (2002)); *see also* Rule 19(a), SCRCrP. The trial court should "grant the directed verdict motion when the evidence merely raises a suspicion that the accused is guilty, as '[s]uspicion' implies a belief or opinion as to guilt based upon facts or circumstances which do not amount to proof." *Cherry*, 361 S.C. at 594, 606 S.E.2d at 478 (citations omitted). On the other hand, "a trial judge is not required to find that the evidence infers guilt to the exclusion of any other reasonable hypothesis." *Id.* (emphasis removed).

■ On appeal, "[w]hen reviewing a denial of a directed verdict, this Court must view the evidence and all reasonable inferences in the light most favorable to the state." *Id.* (citing *State v. Burdette*, 335 S.C. 34, 46, 515 S.E.2d 525, 531 (1999)); *see also State v. Mitchell*, 341 S.C. 406, 409, 535 S.E.2d 126, 127 (2000) (finding that when ruling on cases in which the state has relied exclusively on circumstantial evidence, appellate courts are likewise only concerned with the existence of the evidence and not its weight). If the state has presented "any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused," this Court must affirm the trial court's decision to submit the case to the jury. *Cherry*, 361 S.C. at 593–94, 606 S.E.2d at 478; *cf. Mitchell*, 341 S.C. at 409, 535 S.E.2d at 127 ("The trial judge is required to submit the case to the jury if there is 'any substantial evidence which reasonably tends to prove the guilt of the accused, or from which his guilt may be fairly and logically deduced.'") (emphasis removed) (citation omitted).

## B.  The "Waiver" Rule

Today, our decision depends on *what* evidence we deem appropriate for consideration at the appellate stage of review to assess whether the State presented "any direct evidence or

any substantial circumstantial evidence reasonably tending to prove the guilt of the accused" sufficient to overcome Appellant's mid-trial motion for directed verdict. *See Cherry*, 361 S.C. at 593–94, 606 S.E.2d at 478. In turn, this issue hinges on whether or not we accept the so-called "waiver" rule.[15]

Appellant contends that, when reviewing the propriety of a mid-trial motion for directed verdict, this Court may only rely on evidence presented during the State's case-in-chief, noting that in its brief, the State relies predominately on Lewis's testimony to rebut her argument that the State lacked substantial circumstantial evidence to convict her. To this end, Appellant argues this Court should overrule the court of appeals' recognition of the waiver rule articulated in *State v. Harry*, 321 S.C. 273, 468 S.E.2d 76 (Ct.App.1996), or in the alternative, exclude consideration of Appellant's and Lewis's presentation of evidence in assessing the propriety of the trial court's denial of Appellant's motion.[16]

In *Harry*, the appellant was indicted for two separate counts of arson on the same property. 321 S.C. at 276, 468 S.E.2d at 78. During its case-in-chief, the state presented the

---

**15.** Under the "waiver" rule:

[A] defendant's decision to present evidence in his behalf following denial of his motion for a judgment of acquittal made at the conclusion of the Government's evidence operates as a waiver of his objection to the denial of his motion. If a defendant fails to renew his motion for judgment of acquittal at the end of all the evidence, the "waiver doctrine" operates to foreclose the issue of sufficiency of the evidence on appeal absent a "manifest miscarriage of justice." If a defendant renews his motion for judgment of acquittal at the end of all the evidence, the "waiver doctrine" requires the reviewing court to examine all the evidence rather than to restrict its examination to the evidence presented in the Government's case-in-chief.

*United States v. White*, 611 F.2d 531, 536 (5th Cir.1980) (internal citations omitted).

**16.** The South Carolina Association of Criminal Defense Lawyers also argued these positions in its amicus brief. The State did not file a brief in response to the amicus filing, but made a return by letter dated November 8, 2012, in which it noted that the amicus brief was filed after the close of the briefing cycle and that "Appellant renewed her motion for directed verdict at the conclusion of all the evidence but made no assertion that the trial court should not consider the codefendant's testimony at that time." In addition, the State questioned the relevance of the amicus brief. This was the extent of the State's response to the waiver arguments.

following evidence that the appellant committed arson: (1) the appellant purchased a $25,000 homeowners insurance policy covering the contents of the home approximately two weeks prior to the fire; (2) several stacks of empty, but totally sealed, boxes were found during an inventory of the home; (3) and the appellant provided his insurer with false information about his losses after the fire. *Id.* The appellant made a motion for directed verdict, which the trial court denied. *Id.* at 276–77, 468 S.E.2d at 78. The appellant subsequently put forward a defense during which the following evidence came to light: (1) a person restored power to the home at some point after firefighters extinguished the first fire but before the second fire commenced; (2) the appellant was knowledgeable about transformers and electrical equipment because he worked for an electric company for many years; and (3) the appellant and his mother sustained financial losses after the failure of their pizza business. *Id.*

■ On appeal, the appellant argued that, in reviewing the propriety of the trial court's denial of his mid-trial motion for directed verdict, the court should only review the evidence presented by the state in its case-in-chief, as that was the only evidence available to the trial court when denying the appellant's motion. *Id.* at 277, 468 S.E.2d at 79. Citing *United States v. Byfield*, 928 F.2d 1163 (D.C.Cir.1991),[17] the court of appeals rejected this argument, finding that "when the defendant presents testimony, he loses the right to have the court review the sufficiency of the evidence based on the state's evidence alone." *Harry*, 321 S.C. at 277, 468 S.E.2d at 79. In *Harry*, the court of appeals found instructive the rationale of the Kentucky Supreme Court, holding that the denial of a

---

17. In *Byfield*, the United States Court of Appeals for the District of Columbia Circuit stated, "Although a motion for judgment of acquittal made at the close of the government's case-in-chief is decided on the basis of only that evidence so far introduced at trial ... [the court] must look at the entire record when ruling on the same motion made after trial." *Byfield*, 928 F.2d at 1165–66; *see also United States v. Foster*, 783 F.2d 1082, 1085 (1986) (holding "a criminal defendant who, after denial of a motion for judgment of acquittal at the close of the government's case-in-chief, proceeds with the presentation of his own case, waives his objection to the denial," and noting that "[t]he motion can of course be renewed later in the trial, but *appellate review* of [the] denial of the later motion would take into account all evidence introduced to that point.") (emphasis added).

defendant's motion for directed verdict could not be reviewed on appeal after the defendant did not renew the motion at the close of all evidence:

A motion for a directed verdict made at the close of the [state's] case is not sufficient to preserve error unless renewed at the close of all the evidence, because once the defense has come forward with its proof, the propriety of a directed verdict can only be tested in terms of all the evidence. If there has been no motion for a directed verdict at the close of all the evidence, it cannot be said that the trial judge has ever been given an opportunity to pass on the sufficiency of the evidence as it stood when finally submitted to the jury. In effect, therefore, a motion for directed verdict made only at the close of one party's evidence loses any significance once it is denied and the other party, by producing further evidence, chooses not to stand on it.

*Harry*, 321 S.C. at 277–78, 468 S.E.2d at 79 (citing *Kimbrough v. Commonwealth*, 550 S.W.2d 525, 529 (Ky.1977)) (alterations in original). Thus, the court of appeals held that sufficient evidence existed to support the trial court's denial of the appellant's motion for directed verdict. *Id.* at 278, 468 S.E.2d at 79.

We decline Appellant's invitation to overrule *Harry* and instead adopt its rationale today. *Cf. State v. Thompkins*, 220 S.C. 523, 68 S.E.2d 465 (1951) ("[I]n determining the sufficiency of the evidence to support the verdicts, we must consider the entire testimony, including that offered by appellants. . . . 'We know of no reason why the defendant in a criminal court, who is not content to leave the [government's] case where he finds it, should escape a just conviction simply because he has, unfortunately for himself, completed the proof of his own guilt.'") (quoting *Commonwealth v. George*, 42 Pa. C.C. 643 (1914)).[18]

---

18. In so holding, we recognize that state courts have not uniformly accepted the waiver rule. Appellant and amicus argue this Court should follow other state courts from Alabama, California, Delaware, Florida, Massachusetts, Michigan, and New Jersey, in rejecting the waiver doctrine.

Interestingly, most of the cases espoused by Appellant do not discuss the waiver rule at all, but reject the notion of considering any evidence

## C. "Exceptions" to the Waiver Rule

Citing *Cephus v. United States*, 324 F.2d 893 (D.C.Cir.1963), Appellant and amicus alternatively argue that the waiver rule excludes consideration of a codefendant's testimony in assessing whether sufficient evidence existed to deny a mid-trial directed verdict motion and urge this Court to find that Appellant's defense did not operate as a waiver here because she presented evidence in her defense which did not supplement the State's evidence against her in any way. We agree with Appellant that the waiver rule does not apply in these situations.

In *Cephus*, the United States Court of Appeals for the District of Columbia Circuit dealt with the situation in which a co-defendant incriminated the appellant after he testified in his own defense subsequent to the district court's denial of the appellant's motion for acquittal. 324 F.2d at 894. In finding the government's presentation of evidence insufficient to sustain the guilty verdict, the court stated:

It is clear that if the defendant himself rests on the Government's evidence, the co-defendant's testimony does not waive the defendant's motion. It is also clear that the defendant's own evidence, introduced in response to the

outside the state's presentation based solely on state law precedents stating that the *trial court* may only consider the state's case-in-chief at time the mid-trial motion is made. *See, e.g., State v. C.H.*, 264 N.J.Super. 112, 624 A.2d 53, 61 (N.J.Super.Ct.App.Div.1993) ("[W]hen the motion is made at the conclusion of the State's case, the court is not to review the evidence presented by defendant.") (citation omitted); *Cline v. State*, 720 A.2d 891 (Del.1998) ("The motion for acquittal must be tested solely on the State's case. The defendant's testimony in his case cannot be considered."); *In re Hardley*, 766 So.2d 154, 157–58 (Ala. 1999) ("We must review the denial of [the defendant's] motion at the close of the State's case-in-chief by considering the state of the evidence as it existed at that stage of the trial."). Certainly, our precedents concerning trial court review of a mid-trial directed verdict motion are indistinguishable. *See, e.g., Cherry*, 361 S.C. at 593, 606 S.E.2d at 478. However, the waiver rule does not affect the trial court's scope of review once a party has moved for a mid-trial directed verdict, in that the trial court must only consider the state's evidence. In our view, these other state court opinions conflate the standards applicable to trial court review of mid-trial denials of directed verdicts with appellate review of the propriety of the trial court's denial of the directed verdict motion. In our view, these are two separate standards, and the waiver rule recognizes the distinction.

codefendant's testimony, does not waive the motion if it adds nothing to the Government's case. The waiver question arises only where, as here, the defendant himself, in seeking to explain, impeach, or rebut the co-defendant's testimony, introduces evidence which overshoots that mark and tends to cure a deficiency in the Government's case. We think the waiver doctrine cannot fairly be applied in this situation.

A defendant's attempt to explain, impeach, or rebut a codefendant's testimony does not at all imply that after the defendant made his motion to dismiss, he then re-evaluated the Government's case-in-chief and now thinks it sufficient. It may be both necessary and possible for the defendant to meet the co-defendant's testimony. He should be free to do so without risk that he may be held to have waived his motion.

If the appellant is now deemed to have waived his right to test the sufficiency of the Government's case, the Government will in effect have been able to use the coercive power of the co-defendant's testimony as part of its case-in-chief, even though the Government was prohibited from calling the co-defendant to testify for the prosecution. Although this prohibition arises from the co-defendant's privilege against self-incrimination, its effect excludes from the Government's case-in-chief the testimony of one who has an incentive to exculpate himself by inculpating his fellow defendant.

*Id.* at 897–98 (footnotes omitted); *see Foster,* 783 F.2d at 1085–86 (declining to abrogate the ultimate precise holding of *Cephus,* which refused to broaden the waiver rule to cases in which a defendant has moved for a motion for acquittal, decided not to put up a case, and a co-defendant subsequently introduces evidence incriminating him); *United States v. Johnson,* 952 F.2d 1407, 1411 (D.C.Cir.1992) (disregarding co-defendant testimony in considering the propriety of the trial court's denial of the motion for acquittal).

Most courts that recognize the waiver rule also acknowledge its inapplicability to co-defendant testimony. *See State v. Pennington,* 534 So.2d 393, 396 (Fla.1988) (noting that, where "a codefendant presented the missing-link evidence" during

the defendant's presentation, "a majority of the jurisdictions utilizing the waiver rule would not apply it under these facts because the respondent in this case did not choose to introduce the unproven elements of the offense in his defense"). The rationale behind the co-defendant exception pertains to control. In *United States v. Belt*, the United States Court of Appeal for the Fifth Circuit explained:

> The waiver doctrine is not mere formalism but is an expression of our adversary justice system which requires a defendant to accept the risks of adverse testimony that he introduces. The doctrine's operative principle is not so much that the defendant offering testimony "waives" his earlier motion but that, if he presents the testimony of himself or of others and asks the jury to evaluate his credibility (and that of his witnesses) against the government's case, he cannot insulate himself from the risk that the evidence will be favorable to the government. Requiring the defendant to accept the consequences of his decision to challenge directly the government's case affirms the adversary process. But the decision of a codefendant to testify and produce witnesses is not subject to the defendant's control like testimony the defendant elects to produce in his own defensive case, nor is such testimony within the government's power to command in a joint trial.

574 F.2d 1234, 1236–37 (5th Cir.1978) (footnote omitted). In *Belt*, the appellant "engaged in cross-examination and produced testimony solely because of his codefendant's testimony and directed his efforts to refuting that testimony." *Id.* at 1237. Furthermore, the appellant "did not attempt to refute any element of the proof adduced in the government's case." *Id.* The *Belt* court limited its holding to testimony elicited to rebut a co-defendant's evidence:

> The result we reach is a limited one, applying only to a joint trial and to cross-examination and third-party testimony elicited by the appealing defendant and directed solely to the codefendant's credibility and character. So long as the defendant contents himself with cross-examination of the codefendant and testimony aimed at vitiating the inculpatory testimony given by the codefendant rather than brought

forward by the government, the adversarial purpose of the waiver doctrine is left untouched.

*Id.*

■ We find this rationale persuasive. Here, Appellant did not dispute the State's contention that the victim died from homicide by child abuse inflicted by one of the two defendants. Instead, her testimony rebutted Lewis's contention that she killed the victim. Thus, we recognize an exception to the waiver rule where a codefendant testifies, implicating the defendant, and will not consider Lewis's testimony, or testimony elicited by Appellant that is responsive to Lewis's testimony, for purposes of determining whether the State presented substantial circumstantial evidence sufficient to survive Appellant's mid-trial motion for directed verdict.

In addition, Appellant contends that we should not consider her defense in assessing the trial court's denial of her directed verdict motion. Appellant contends that *Cephus* stands for the proposition that "if the defendant's case does not provide a missing link in the Government's evidence or rectify any deficiency in the State's case, the presentation of a defense does not operate as a waiver of the right to have an appellate court review the mid-trial denial of a motion for directed verdict on the State's evidence alone."

■ In *Cephus,* the court stated that regardless of whether the waiver rule applies, "if the defendant then rests or if he introduces evidence which adds nothing to the Government's evidence, the sufficiency of the Government's case-in-chief may be reviewed on the appeal from a conviction." *Cephus,* 324 F.2d at 895 (footnote omitted). Moreover, when referring to co-defendant testimony, the court stated further, "It is also clear that the defendant's own evidence, introduced in response to the codefendant's testimony, does not waive the motion if it adds nothing to the Government's case." *Id.* at 897. Thus, the *Cephus* court took it as a given that when the defendant testifies and does not provide any gap-filling evidence for the government's case, then a reviewing court need not consider that testimony. Likewise, we hold that where a defendant's evidence does not serve to fill gaps in the state's evidence, her testimony does not operate to waive consider-

ation of the evidence as it stood at the close of the state's case.[19]

19. The fact that Appellant testified, necessarily placing her credibility in issue, further does not operate to waive consideration of her testimony where the testimony does not present patent inconsistencies with the State's evidence. Here, the jury obviously did not believe Appellant's version of events, and that presents a dilemma for any court assessing whether the defendant has provided evidence that fills gaps in the State's case. *United States v. Zeigler,* 994 F.2d 845, 850 (D.C.Cir.1993) (noting "[t]here is no principled way of deciding when the government's proof, less than enough to sustain the conviction, is nevertheless enough to allow adding negative inferences from the defendant's testimony to fill the gaps," the court held that because mere speculation supported the defendant's conviction, it could not "determine whether [the defendant], by her demeanor on the stand, supplied the evidence needed to support her conviction."); *see also United States v. Bailey,* 553 F.3d 940, 946–47 (6th Cir.2009) ("The district court is correct that assessment of the credibility of the witness lies within the province of the jury. In reviewing the sufficiency of the evidence, however, the court of appeals must not 'allow the jury's discrediting of the defendant's testimony to make up for a shortfall in the sufficiency of the government's evidence.' Although the sufficiency-of-the-evidence standard is highly deferential to the jury, we cannot let this deference blind us on review to the government's burden to prove guilt beyond a reasonable doubt. Regardless of whether the jury believed [the witnesses'] oral testimony that [the defendant] did not have control over the firearm found by the police underneath [the defendant's] seat, the prosecution had the burden of producing sufficient evidence to convict.") (alterations added) (quoting *United States v. Toms,* 136 F.3d 176, 182 (D.C.Cir.1998); *United States v. Sliker,* 751 F.2d 477, 495 n. 11 (2nd Cir.1984) ("Although [demeanor] is a legitimate factor for the jury to consider, this could not remedy a deficiency in the Government's proof if one existed."); *Dyer v. MacDougall,* 201 F.2d 265, 269 (2nd Cir.1952) ("He, who has seen and heard the 'demeanor' evidence, may have been right or wrong in thinking that it gave rational support to a verdict; yet, since that evidence has disappeared, it will be impossible for an appellate court to say which he was.")). The State avers that the victim died as a result of child abuse at the hands of either Appellant or Lewis, but every State witness attested that Appellant was asleep until Lewis woke her up with the unresponsive victim in his arms. Moreover, Appellant's testimony as to the main issue of whether she harmed the victim corroborated that she was asleep during the time period the victim was injured. Appellant's testimony did not highlight any patent inconsistencies and was not contradictory to the State's evidence, and therefore, did not fill any gaps in the Government's case. *See United States v. Dingle,* 114 F.3d 307, 312 (D.C.Cir.1997) (finding *Zeigler's* general rule is inapplicable where " 'the defendant's testimony, on its face, [is] utterly inconsistent, incoherent, contradictory, or implausible,' " and therefore, "[w]hile [the defendant's] testimony was not internally inconsistent, the government's rebuttal evidence made it

In sum, we hold that the waiver rule is operative. However, because Appellant's co-defendant testified and implicated her and because Appellant's testimony merely rebutted this testimony, we will not consider either testimony in assessing the propriety of the trial court's denial of Appellant's mid-trial directed verdict motion.

## C. Sufficiency of Evidence

Absent Lewis's and Appellant's testimony, the State has not presented substantial circumstantial evidence on which the trial court could have based the denial of Appellant's motion for directed verdict with respect to the homicide by child abuse charge.[20]

The homicide by child abuse statute provides:

(A) A person is guilty of homicide by child abuse if the person:

(1) causes the death of a child under the age of eleven while committing child abuse or neglect, and the death occurs under circumstances manifesting an extreme indifference to human life; or

(2) knowingly aids and abets another person to commit child abuse or neglect, and the child abuse or neglect results in the death of a child under the age of eleven.

(B) For purposes of this section, the following definitions apply:

(1) "child abuse or neglect" means an act or omission by any person which causes harm to the child's physical health or welfare;

(2) "harm" to a child's health or welfare occurs when a person:

---

extremely *implausible*" and "[a] *jury viewing the government's evidence could reasonably find that [the defendant's] account was false, regardless of his demeanor, and that he was in the apartment for illicit purposes.*") (quoting *Zeigler*, 994 F.2d at 849).

**20.** Appellant was acquitted of aiding and abetting child abuse, so the propriety of the trial court's ruling in that respect is not before this Court on appeal.

(a) inflicts or allows to be inflicted upon the child physical injury, including injuries sustained as a result of excessive corporal punishment . . .

S.C.Code Ann. § 16–3–85 (2003).

Relying on *State v. Bostick,* 392 S.C. 134, 708 S.E.2d 774 (2011), and *State v. Odems,* 395 S.C. 582, 720 S.E.2d 48 (2011), Appellant contends that the trial court erred in finding that the State presented *substantial* circumstantial evidence sufficient to deny Appellant's motion for directed verdict.

As in this case, in *Bostick,* the State presented entirely circumstantial evidence that the defendant committed murder. 392 S.C. at 140, 708 S.E.2d at 777. The trial court denied the defendant's directed verdict motion, based on the State's presentation of the following evidence: (1) the victim's personal items were found in a burn pile in a neighboring home owned by the defendant's mother; (2) a heavy petroleum product was used as an accelerant in the burn pile and the defendant's mother testified she was afraid to use such accelerants and did not use them; (3) a pattern of gasoline was found on the defendant's shoes and was used as an accelerant to start a fire in the victim's home after her assailant struck her; and (4) blood was found on the defendant's jeans and the DNA expert testified she could not conclusively state that blood found on the defendant's jeans was the victim's, even though she could exclude 99 percent of the population. *Id.* at 141–42, 708 S.E.2d at 778. On this evidence, the Court reversed the trial court, finding the state had not presented substantial circumstantial evidence sufficient to submit the case to the jury. *Id.* at 142, 708 S.E.2d at 778.

Likewise, in *Odems,* the defendant was convicted of first degree burglary, grand larceny, criminal conspiracy, and malicious injury to an electrical utility system, and this Court reversed the trial court after it denied the defendant's directed verdict motion. 395 S.C. at 582, 720 S.E.2d at 48. In that case, the state presented the following circumstantial evidence: (1) less than 90 minutes after the burglary, police found the petitioner in the getaway car with the burglars and the stolen goods; (2) the petitioner fled from law enforcement; and (3) the petitioner asked an uniformed person to lie for him. *Id.* at 588, 720 S.E.2d at 51. To the contrary, other

evidence presented tended to obviate the petitioner's guilt, in that the sole eyewitness saw only two people at the crime scene; a forensic investigator collected twelve sets of fingerprints from the crime scene, none of which matched the petitioner's fingerprints; and a co-defendant testified during the State's case-in-chief that the petitioner did not participate in the crime but was present in the car after he offered him a ride. *Id.* This Court reversed, finding that there was not substantial circumstantial evidence on which to base a conviction, and therefore, the trial court erred in refusing to direct a verdict in favor of the petitioner. *Id.* at 592, 720 S.E.2d at 53.

Appellant contends that the State's evidence "falls woefully short" of the standard set by this Court's precedents concerning the modicum of evidence constituting substantial circumstantial evidence sufficient to withstand a directed verdict. On the other hand, the State contends it presented substantial circumstantial evidence warranting the trial court's denial of the Appellant's directed verdict motion, focusing on Appellant's circumstances at the time of the victim's death, namely scant evidence that she was frustrated by her failure to secure employment, living situation, and parental responsibilities; the medical testimony concerning the severity of the victim's injuries; but most predominantly *Lewis's testimony* that he heard Appellant shake the victim prior to finding her unresponsive in her crib.

Barring Lewis's testimony, as outlined *supra,* we find the State did not present substantial evidence that Appellant killed the victim. Every State witness placed Appellant asleep at the time the victim sustained the fatal injuries. While undoubtedly present at the scene, the only inference that can be drawn from the State's case is that one of the two co-defendants inflicted the victim's injuries, but not that *Appellant* harmed the victim. Thus, we reverse the trial court's refusal to direct a verdict of acquittal because the State did not put forward sufficient direct or substantial circumstantial evidence of Appellant's guilt.

Although not raised by the State, due the similar nature of the charges and facts, the court of appeals' case, *State v. Smith,* 359 S.C. 481, 597 S.E.2d 888 (Ct.App.2004), bears mentioning. In that case, the court of appeals held that the State had presented substantial circumstantial evidence suffi-

cient to overcome the motion for directed verdict based, in part, on the fact that the two co-defendants were the only responsible adults that could have inflicted or been aware of the victim's fatal injuries. The facts of *Smith* are very similar to those here, in that the 20–month–old child died while in the custody of her mother and her mother's boyfriend (Smith) while on a vacation to the beach. *Id.* at 483, 597 S.E.2d at 889. The State's case, as here, was entirely circumstantial and the two suspects were tried together as co-defendants. In that case, the court of appeals found that Smith was not entitled to a directed verdict, in part because all of the evidence adduced by the State at trial indicated that during the time period in question, Smith and the victim's mother "were the only two persons with [the victim] who could have possibly caused her injury." *Id.* at 491, 597 S.E.2d at 894. In their respective statements to investigators, the victim's mother told investigators she was with the victim the entire time, and Smith "referred to all of their actions that day as 'we,' never indicating a time when he and [and the victim's mother] were not together during that weekend." *Id.* Moreover, the court noted that the medical testimony indicated that the victim experienced more than one blow to the head and shaken baby syndrome, of which symptoms would have been severe and immediate, and importantly, obvious to both Smith and the victim's mother very soon after the injuries were inflicted. *Id.* at 491–92, 597 S.E.2d at 894.

Noting that the child abuse statute "makes clear that child abuse may be committed by either **an act or an omission** which causes harm to a child's physical health," S.C.Code Ann. § 16–3–85(B)(1), and "harm to a child's health occurs when a person either **inflicts, or allows to be inflicted** physical injury upon a child," S.C.Code Ann. § 16–3–85(B)(2)(a), the court concluded:

> Given the evidence on the severity and number of injuries to [the victim], the fact that both Smith and [the victim's mother] were the only adults with [the victim] during the time frame that she received her injuries and were the only people who could have possibly caused her injuries, the evidence that her impairment should have been obvious to these two adults, along with the evidence of possible cover-up, we find there was sufficient evidence of an act or omission by Smith wherein he inflicted or allowed to be

inflicted physical harm to [the victim] resulting in [the victim's] death. Accordingly, there was substantial circumstantial evidence reasonably tending to prove the guilt of Smith such that the charges were properly submitted to the jury.

*Smith*, 359 S.C. at 492, 597 S.E.2d at 894.

Homicide by child abuse cases are difficult to prove because often the only witnesses are the perpetrators of the crime. What separates this case from a case like *Smith* is that every piece of the State's evidence establishes (1) Appellant was asleep at the time the victim sustained her injuries, (2) Appellant was only awoken after Lewis retrieved the unresponsive victim from her crib, and (3) the victim appeared to be acting normally until after Appellant put the victim to sleep and went to sleep herself. As in *Smith*, medical testimony adduced at trial indicated that the victim would not have appeared "normal" within a short period of time after her injuries were inflicted due to the nature and extent of her neurological injuries. However, there is no evidence that Appellant herself was aware of the victim's injuries, let alone caused them. Thus, we find this case distinguishable from *Smith*.

We hold that, absent Lewis's interested testimony and the ability to assess Appellant's credibility on the witness stand, the State did not present substantial circumstantial evidence sufficient to warrant the denial of Appellant's mid-trial directed verdict motion.

While we are mindful that the net result of our decision is to overturn a jury verdict reached with all due deliberation and diligence, we are called by our standard of review to consider the evidence as it stood after the State presented its case, and we are not satisfied that the evidence was sufficient to sustain the State's ultimate burden of proof in this case.

### CONCLUSION

Based on the foregoing, we find the trial court erred in refusing to grant Appellant's mid-trial motion for directed verdict, and now direct a verdict of acquittal.

**REVERSED.**

BEATTY, KITTREDGE and HEARN, JJ., concur.
PLEICONES, J., concurring in result only.